Lake Erie and Western Railroad Company *v.* Stick.

No. 17,223.

LAKE ERIE AND WESTERN RAILROAD COMPANY *v.* STICK.

| | |
|---|---|
| 143 | 449 |
| 142 | 624 |
| 143 | 525 |
| 143 | 449 |
| 144 | 457 |
| 145 | 556 |
| 146 | 309 |
| 146 | 376 |
| 147 | 567 |
| 143 | 449 |
| 148 | 58 |
| 148 | 121 |
| 148 | 311 |
| 149 | 67 |
| 149 | 412 |
| 149 | 508 |
| 150 | 579 |
| 150 | 582 |
| 151 | 592 |
| 143 | 449 |
| 153 | 169 |
| 143 | 449 |
| 158 | 499 |
| 143 | 449 |
| 159 | 134 |
| 143 | 449 |
| 161 | 180 |
| 143 | 449 |
| 163 | 615 |
| 143 | 449 |
| 165 | 473 |

APPELLATE PROCEDURE.—*Reversal of Judgment.*—*Sufficiency of Evidence.*—The Supreme Court cannot reverse a judgment and order a new trial on the ground that the fair or overwhelming preponderance of the evidence is against the verdict where there is evidence which is legally sufficient, standing alone, to establish the material allegations of the complaint.

RAILROAD.—*Personal Injury of Traveler at Crossing.*——*Contributory Negligence.*—A finding that plaintiff in an action for personal injuries received in a collision with an engine at a highway crossing was free from contributory negligence is not supported by evidence legally sufficient, standing alone, so as to preclude the appellate court from disturbing it, where it rests entirely upon plaintiff's evidence that the engine was running at from twenty-five to thirty miles an hour, and that, although his view was unobstructed and his hearing exceptionally good, he did not observe its approach upon stopping to look and listen.

From the Jay Circuit Court.

*W. E. Hackedorn* and *J. B. Cockrum*, for appellant.

*Orr, Leffler & Smith*, for appellee.

McCABE, J.—The appellee sued the appellant in the Delaware Circuit Court to recover damages on account of a personal injury which he alleged was inflicted on him by the negligence of the appellant. The venue was changed to the Jay Circuit Court where a trial resulted in a verdict and judgment against the appellant for $4,000.00 over its motion for a new trial.

It is assigned for error here that the circuit court erred in overruling a demurrer to each of the first and second paragraphs of the complaint, in overruling the

defendant's motion for judgment in its favor on the answers to interrogatories notwithstanding the general verdict, and in overruling appellant's motion for a new trial.

Among the reasons assigned in the motion for a new trial are that the verdict is not supported by, and is contrary to, the evidence and the law, and that the court erred in giving and refusing certain instructions.

The principal ground relied on by the appellant is the insufficiency of the evidence.

The appellant's railroad track runs in a southwesterly direction from the northeast through the westerly edge of the unincorporated village of Albany, in Delaware county, whose streets run due north and south and east and west.

The street known as the Albany and Mississinewa pike or Pike street, runs east and west through the town and crosses the appellant's track about 200 feet southwest of appellant's passenger depot, situated twenty feet southeast of said track. A bay window on the west or northwest side of the depot left sixteen feet and eight inches between the east or southeast rail of the track and the bay window. The appellant's right of way is level and nearly straight, there being no curves from Pike street to the east or northeast until it crosses the Albany and Eaton pike, which is northeast from Pike street crossing 1,665 feet. Pike street crossing is where the injury occurred. That street is sometimes called the Albany and Mississinewa pike and sometimes Pike street. Appellant's roadway was 100 feet wide and Pike street was fifty feet wide. The appellee lived on the west or northwest side of appellant's track and south from Pike street some 100 yards or more. The principal business part of the town was east or southeast of appellant's roadway.

Appellee had before that time been in the habit, when coming from home up into town, of passing from his home to the west or northwest embankment of the railroad and then passing along that to Pike street, and thence along that street up into town and traveling the same route in returning home. He had lived at that place for a number of years and was familiar with all the surroundings, including the railroad track, buildings, crossings, etc. He had often passed over the track at Pike street crossing. He also knew the character of trains, including engines with tenders attached thereto, that passed at regular and irregular times. His eye-sight and hearing were both good and he was a spry, active man, able to walk and step around actively.

Shortly before the time he was injured he had left his home and by the usual route walked up into town, and while there did some shopping and then started on his return home. For a short distance he walked on the side of Pike street and before reaching the crossing of the railroad he passed out into the middle of Pike street. The street and the railroad were substantially on a level, so that ordinarily an engine could be seen approaching on the track a half mile east or northeast from the Pike street crossing, by a person standing within six or eight feet southeast of the east or southeast rail at said crossing. The appellee proceeded along Pike street west approaching the railroad crossing, and on reaching the crossing was struck by a passing engine of appellant and injured. Appellant, as had been its custom, was transferring an engine and tender attached thereto from Lima to Lafayette. It was being run by T. A. Hurley, engineer, and A. T. Railsback, fireman. Another similar engine and tender, also being transferred, was some 300 to 350 feet behind the first in charge of another engineer and fireman. The engineer

and firemen above named were sober and competent to discharge their respective duties.

The collision occurred on the 19th day of February, 1891, between five and six o'clock suntime, or at 5:20 o'clock P. M. railroad time; it was not dark, but was between sundown and dark; it was twilight. During the afternoon some rain had fallen, but at the time of the injury it was not raining. The engine was what is known as a mogul engine with tender attached and fifty-five feet in length. It had six wheels. The tender was nineteen feet long and had eight wheels, four on a side. The height of the engine from the smoke stack to the ground was fifteen feet, the smoke stack rising fifty-four inches above the body of the engine. The engine weighed eighty tons, including the tender.

The evening at the time appellee was injured was still and quiet. The engine at the time was running at the rate of twenty-five to thirty-five miles an hour.

The appellee testified that when within six or eight feet of the track he stopped and attentively listened and looked for an approaching train both ways and did not see any train or hear one. Could have heard a watch ticking ten or twelve feet away, but did not hear the engine until it struck him, "did not go inside the rail until I was struck by the engine. With a head-light burning I could see an engine at night a mile up the track. From where I stood I could not see further east than to the depot on account of the weather. It was about 200 feet to the depot. My eye-sight was good. I could then read an ordinary newspaper without glasses. There was no machinery of any kind near there to make noise to interfere with me hearing. Nothing to keep me from hearing. The engine made no noise as it came up behind me. I heard no ringing of the bell or sound of the whistle. There were no sig-

nals whatever given. I had no notice of any engine coming. I saw no headlight. I presume I looked up the track past the big part of the depot. I knew it was a dangerous place at the crossing. There are generally some trains running on the road after night. They go through at irregular hours." The foregoing statement of facts outside of the appellee's testimony is either uncontradicted or where there is a conflict the version of the facts are most favorable to the appellee and as given by his witnesses has been adopted.

Actionable negligence is made up of three elements, according to our decided cases, all of which must be alleged and proven affirmatively by the plaintiff in order to recover. Those elements are first, the defendant's negligence; second, the plaintiff's freedom from fault or negligence in the matter complained of, and third, damage to the plaintiff proximately caused by the defendant's negligence. The failure to establish any one of these elements by the evidence is as fatal to a recovery as the failure to establish each and every one of them. *Ohio, etc., R. W. Co.* v. *Hill, Admx.*, 117 Ind. 56; *Chicago, etc., R. W. Co.* v. *Hedges, Admx.*, 118 Ind. 5; *Louisville, etc., R. W. Co.* v. *Stommel*, 126 Ind. 35; *Indiana, etc., R. W. Co.* v. *Hammock*, 113 Ind. 1; *Pennsylvania Co.* v. *Meyers, Admx.*, 136 Ind. 242; 16 Am. and Eng. Ency. of Law, 388–9.

The plaintiff is required to establish all these elements of his cause by a fair preponderance of all the evidence. The particular acts of negligence charged against the appellant were: "that as the plaintiff approached the crossing the defendant, by its agents and servants, was also approaching said crossing from the northeast with two engines or locomotives to which no car was attached, one following the other, and about 300 or 350 feet apart, * * negligently racing one of said engines

with the other * * * at a great and dangerous rate of speed * * of forty-five miles per hour, to the deadly peril of limb and life of plaintiff. * * * That no signal or warning was given of the approach of said engines, and the whistle was not sounded nor was the bell rung within 100 yards of said crossing, it then being the twilight hour and the sky overcast with clouds, and said engines were running so swiftly that they made no rumbling sound and gave no warning whatever of their approach, * * * and without fault or negligence on his part, he was struck and run upon by one of said engines * * * and * * was knocked and thrown from the crossing to the ground with great violence, and the bones of his shoulder and upper part of the arm and * * of his leg and hip and other bones of his body were broken and crushed, etc."

From the evidence as it appears to us in the record, not only was there no preponderance of evidence in support of the charge of negligence against the defendant and the plaintiff's freedom from negligence contributing to his injury, but as it appears to us on paper the overwhelming preponderance of the evidence establishes that the appellant was not guilty of the negligence alleged or any part of it, and that the appellee·was guilty of negligence contributing to his injury. But we have no power to weigh the evidence, and if there is evidence tending to support the verdict, which is legally sufficient, standing alone, to establish the material allegations of the complaint, this court cannot reverse the judgment and order a new trial, even though what appears to be the fair or overwhelming preponderance seems to be against the verdict. In *Cincinnati, etc., R. R. Co.* v. *Madden*, 134 Ind. 462, at pages 469–70, this court said that: "The jury and the trial court are the best judges of the weight of the evidence where there is a conflict in

it, because they have vastly better opportunities and means of weighing and estimating the weight of conflicting evidence than this court has.   The judge of the trial court has just as good an opportunity and as efficient·means of weighing the testimony as the jury has.   And though the jury are the exclusive judges of the weight of the evidence, that only lasts until their verdict is returned and a motion for a new trial is filed in which is assigned as a reason therefor that the verdict is not supported by sufficient evidence..   Then the trial judge becomes the judge of the weight of the evidence, and if, in his opinion, the preponderance of the evidence is against the verdict so strong that he should have felt compelled to have found the other way, the law makes it his duty to grant the motion for a new trial.   While it is sometimes strongly asserted that trial judges, for want of courage, shrink from this plain duty, yet the legal presumption is that the trial judge has conscientiously, faithfully, and courageously discharged his·whole duty, and that presumption continues on an appeal until the contrary is made to appear affirmatively by the record of this court.   Hence, the propriety of the rule in this court that affirms the verdict, if the evidence that tends to support it, considered alone, is sufficient to justify the jury in finding it.   This court cannot know but that the jury had good and sufficient reasons for discrediting the evidence that conflicted with their finding; and even if it were possible to suppose the jury had made a mistake in weighing the evidence, the trial judge, we are bound to presume, has calmly and impartially reviewed it, after having heard it all, with the same means of observing the manner and appearance of the witnesses, and all other circumstances of the trial likely to aid in correctly weighing the evidence, and by his action in

overruling the motion for a new trial, says in effect to us that he thinks the weight of the evidence justifies the verdict of the jury."

That such a record as the one now before us should reach this court once in a while is not so passing strange as to call for special notice. But when we find such a condition of the verdict and evidence appearing here so frequently and uniformly in this class of cases it is enough to excite our wonder. If it sometimes happened that the verdict was for the defendant in such cases, and that what appears to us as a preponderance of the evidence was against such verdict, or that it was not supported by such preponderance, then it would look more than it does now like the jury had fairly, candidly, and for good reason, discredited and disbelieved the testimony of some of the witnesses. But when we find that they uniformly and with scarcely a single exception always discredit the witnesses that happen to testify on behalf of the defendant in such cases, it does seem passing strange and naturally excites suspicion that juries have the impression that railroads and other corporations are the legitimate prey of every one who is bold enough to file a claim against them in court regardless of the evidence or the facts. These things reflect no credit upon our jurisprudence, nor can we close our eyes to them. But however great the suspicion that the jury has through prejudice, or sympathy, or both, disregarded the weight and preponderance of the evidence, this court is powerless to remedy the evil because it has no power to weigh the evidence. *Deal* v. *State*, 140 Ind. 354. The remedy for the evil is solely in the hands of the trial judge.

The occurrences mentioned happening so frequently and uniformly ought to arouse his wakeful vigilance, and his courage when need be, to set aside a verdict

where the jury has usurped the power to disregard the plain preponderance of the evidence and thus make his court a court of justice in reality as well as in name. His failure or refusal to do so is fraught with the most dangerous consequences to the rights of property, because in case of conflict of evidence there is no other remedy. It is to turn over to the unbridled will of juries the property of such defendants to bestow the same on such plaintiffs as the pleasure or sympathy of the jury may dictate regardless of the legal rights of such defendants.

While the condition of the evidence is such as to the negligence charged against the appellant under the foregoing rules that we cannot disturb the verdict on account of the apparent preponderance of the evidence being against the verdict, yet that is not the case as to the appellee's alleged freedom from negligence contributing to his injury.

In *Indiana, etc., R. W. Co.* v. *Greene, Admx.*, 106 Ind. 279, at page 282, this court said : "It may suffice to say, since it is the established rule of this court, as it is of the courts in a large majority of the States, that it must be affirmatively shown that the injured party was in the exercise of due care at the time the accident occurred. At least it must be made to appear that want of care on his part in no way contributed to bring about the injury, or helped to produce the accident for which compensation is sought."

If we must accept the testimony of the appellee as true, then perhaps he has brought himself within the above rule and shown affirmatively that he was in the exercise of due care when the accident occurred. ·

In *Mann* v. *Belt R. R., etc., Co.*, 128 Ind. 138, at pages 142–3, this court said : "When one approaches a point upon the highway where a railroad track is

crossed upon the same level, it is his plain duty to proceed with caution, and if he attempt to cross the track, either on foot or in a vehicle of any description, he must exercise, in so doing, what the law regards as ordinary care under the circumstances.   He must assume that there is danger, and act with ordinary prudence * * under the circumstances.   The law defines precisely what the term 'ordinary care under the circumstances' shall mean in these cases.   In the progress of the law in this behalf, the question of care at railway crossings, as affecting the traveler, is no longer, as a rule, a question for the jury.   The *quantum* of care is exactly prescribed as matter of law.   In attempting to cross, the traveler must listen for signals, notice signs put up as warnings, and look attentively up and down the track. * * If a traveler, by looking, could have seen an approaching train in time to escape, it will be presumed, in case he is injured by collision, either that he did not look, or, if he did look, that he did not heed what he saw.   [Citing authority]   * *   Where a person thus approaching a railroad crossing could have seen the train by looking, before he attempts to cross, and a collision occurs, it will be presumed he did not look, and by the neglect of so plain a duty he is guilty of such negligence as precludes him from recovering.   [Citing authority.]   Mental absorption or reverie induced by grief or business, will not excuse the omission of the duty to look and listen."

But the appellee testifies to a full compliance with this rule of legal duty, that he stopped within six or eight feet of the track and looked and listened attentively for an approaching train both ways, and did not see or hear any, though his hearing and eye-sight were exceptionally good, and that he did not hear the engine until it struck him.   But he says that he could see from

the crossing to the depot, 200 feet east, from whence the engine was coming.

It is undisputed that the engine and tender weighed eighty tons, and altogether had fourteen wheels, and appellant's witnesses put the rate of speed it was running at twenty-five to thirty-five miles per hour.

The puzzling question arises, how could such a vast weight of iron on iron wheels, fourteen in number, run at that rate of speed over iron or steel rails and make no noise so that a person of exceptionally good hearing, able to hear the tick of an ordinary watch ten or twelve feet, could not hear it.

In the case last quoted from, at page 144, it is said: "The courts cannot close their eyes to matters of general notoriety, and to matters of every day observation. We must know that a train of cars passing over iron or steel rails at a speed of thirty miles an hour does not do so without noise. We must know, too, that where a person possessing good eye-sight, located within one hundred feet of a track, has an unobstructed view of such track for a distance of near one-half mile, he cannot fail to see an approaching train before it reaches him if he looks attentively, and that if he is possessed of ordinary hearing he could not fail to hear it when listening attentively, if running at the speed of thirty miles an hour." 12 Am. and Eng. Ency. of Law, 195 and authorities there cited.

Appellee introduced four witnesses only as to the accident, besides himself, two of them being his daughters living with him, and two of them disinterested. The first one after himself was William Waltz. He testified that: "I was at his house when he got hurt. * * * The young ladies (appellee's daughters) were sitting in the room at his house. I saw an engine coming very fast. * * * The engine, when I saw it, was 400 or

500 feet west of the water tank. * * * I first saw the engine 100 to 150 feet from the house. * * * I could see the man that sat on the engine next to me. I think the engine stopped about 300 feet from where I first saw it. * * * The engine * * * was not puffing but I could hear it as it went by. * * * It was about dusk ; it was not dark. * *. * Some one got off the engine and came back along the track and gave.notice that the old gentleman was hurt."

Appellee's next witness was William Smith, who testified that: "Just as I came to the track I looked up to the northeast and saw an engine coming down the track from the northeast. * * * I waited till it passed me. There was * * * another engine * * * following this one. There was no noise made and no signal * * * given or sound of any kind before it came up to where I was. * * * The head engine made so much noise after it passed me that I could not hear the second one." This witness, when the engine passed him, was east or northeast of the Pike street crossing.

The appellee's next witness was his daughter, Flora Stick, who testified: "I was in the house when the accident occurred * * * I heard the engine passing and saw it passing the house. I went to the door to see what it was that passed so fast. * * * I saw it stop and saw the fireman come running and told us that father was hurt. * * * We heard the engine as it went by. We went to the door and saw the engine. Myself and Mr. Waltz 'was' at our house. We both went to the door. * * * I noticed the number on the side of the engine, it was 2. I could see it from the door. * * * Saw the number on the engine 150 feet from the house."

Appellee's next witness was his daughter, Ruth Gil-

lan, who testified: "I saw the engine as it passed the door. Our house fronts towards the railroad. I saw the fireman get off the engine. When he got off he ran back towards our house and first gave us notice that father was hurt. * * * I could hear the noise of the engine as·it went past."

These four witnesses, all introduced by the appellee, two of them his children and members of his household, all squarely contradict him, as our common knowledge also does, as to whether the engine made noise and could be heard several hundred feet. They also contradict his testimony saying "I looked and listened as I came up to the railroad. I looked both ways. I heard no sound and saw no train."

If his four witnesses tell the truth, he either did not look and listen as he approached the track, or, if he did, his eye-sight and hearing being good, as he states, he saw and heard the approaching engine but did not heed what he saw and heard. In either case, according to the established law as above stated, he could not recover.

Yet it may be true that he had a right to contend before the jury and the trial court and convince them if he could that he told the truth on that point, and that all of his own witnesses upon that point, besides himself, as well as all of appellants, testified falsely, and having secured a verdict to that effect, which the trial judge upheld against a motion for a new trial, he may now insist that the jury were the exclusive judges of the weight of the evidence until after verdict, and that thereupon the trial judge had the exclusive power to review and reweigh the evidence on the motion for a new trial, and say as he has done in overruling it, that the preponderance of the evidence supports the verdict, and that this court cannot disturb it by reweighing the evidence.

While this may all be true, yet we are unable to see upon what principle of moral ethics, reason or philosophy, the jury and trial judge could have reached the conclusion that these four witnesses, introduced by appellee, were all unworthy of belief on the point now in question, and that the interested plaintiff was worthy of more credence than all of them together, and yet, at the same time, believe those same four witnesses against an array of ten witnesses on behalf of the appellant on the question of the appellant's alleged negligence. This great array of witnesses on behalf of appellant shows clearly and plainly that appellant was not guilty of any negligence in connection with appellee's injury. They show that the speed of the engine was moderate, from twelve to fifteen miles an hour, that all proper signals were given, that the whistle was sounded at the proper times and places, and that the bell was continuously rung from the time the engine approached the town until it stopped after the collision with the appellee. And the evidence shows that these witnesses had the very best of means of knowing the facts about which they testify. We do not mean to say that it was not the exclusive province of the jury to determine which set of witnesses whose testimony conflicted with the others was most worthy of belief. But we do say that after the jury had condemned the appellee's four witnesses as unworthy of belief as to his alleged freedom from negligence, it is past our comprehension to conceive any reason consistent with good faith on their part to turn round and believe those same four witnesses as to appellant's alleged negligence against an array of ten witnesses to the direct contrary. Especially is this so in view of the legal presumption arising when a person crossing a railroad track is injured by a collision with a train that the fault is *prima facie* his own. *Cincinnati,*

*etc.*, *R. R. Co.* v. *Butler*, 103 Ind. 31; *Indiana, etc., R. W. Co.* v. *Hammock, supra; Hathaway* v. *Toledo, etc., R. W. Co.*, 46 Ind. 25; and the further legal presumption if the view is unobstructed, as was shown beyond dispute here, that he actually saw what he could have seen if he had looked, and heard what he could have heard if he had listened. *Cones, Admr.*, v. *Cincinnati, etc., R. W. Co.*, 114 Ind. 328. The action of the trial judge in overruling the motion for a new trial looks very much as if he were laboring under the supposition that he possessed no power to review and reweigh the evidence on a motion for a new trial. Such is not the law. *Cincinnati, etc., R. R. Co.* v. *Madden, supra.*

The jury are not omnipotent, they are not a law unto themselves, but their verdict and finding must be according to the law and the evidence, however much they may desire, through sympathy, friendship or prejudice, to bestow by their verdict the property of one party litigant on the other.

It is the bounden duty of the trial judge to see to it that they do not do so, and if they do, to set aside their verdict promptly.

Excluding from consideration all evidence in the case as we must, under the rules above stated, that conflicts with the testimony of the appellee, as to his exercise of due care and his freedom from fault and negligence contributing to his injury, but considering alone his testimony upon that point, and the matters of general notoriety and matters of every day observation and our knowledge of the laws of nature, we must and do know that the engine going at the rate of speed of twenty-five to thirty-five miles an hour, the appellee must have and did hear it, but must have been so absorbed in mental reverie or abstraction that he did not realize that he heard it, and with an unobstructed view as he

had he must have seen it in time to escape if he looked as he says he did, but that the same causes prevented him from realizing that he did see it. And, therefore, his evidence was not sufficient to prove that he was free from contributory negligence. Therefore one of the indispensable elements or facts constituting the appellee's cause of action being unproved, that is, the evidence being legally insufficient to establish that fact, the verdict is not supported by the evidence, no matter how much such evidence may tend to support the other essential averments in the complaint. *Cincinnati, etc., R. W. Co.* v. *Wynant,* 134 Ind. 681.

Among the instructions complained of in the motion for a new trial was the 15th, given at the request of the plaintiff, as follows: "A railroad company owes a positive duty to persons lawfully using a public highway, and the crossing of its track at the same grade or level to so run and manage its engines and trains, and control and regulate their speed, and to have and hold them in such reasonable control and subjection that they may not inflict unnecessary and reasonably avoidable injury upon the persons lawfully and necessarily using the crossing. The company must not only give the signals required by the statute, but in any case where ordinary care and reasonable prudence dictates, it must give such other signals and warnings and so regulate and control the rate of speed as the surroundings and the necessities of the case demand.

" It must even stop the engine if the necessity of the case requires that that should be done in order to avoid injury to one on the crossing, if by the exercise of reasonable and proper care such person might or could have been seen in time, by the proper and reasonable use of the means at command, to have stopped the engine and thereby avoid the infliction of injury."

Lake Erie and Western Railroad Company *v.* Stick.

This instruction possibly might be correct in a case wherein the facts made it applicable, but we do not decide whether it would or not.   As was said in *Louisville, etc., R. W. Co.* v. *Philips,* 112 Ind. 59, at page 62: "If the employees see a man bound to the rails in time to check the train, they must use reasonable measures to check it, and not suffer it to run upon the helpless man; * * * nor could it, even in such a case, be held liable unless the employees knew of the helpless condition of the person on the track."   To the same effect are *Indiana, etc., R. W. Co.* v. *Pitzer,* 109 Ind. 179 ; *Lafayette, etc., R. R. Co.* v. *Huffman,* 28 Ind. 287 ; *Lake Shore, etc., R. R. Co.* v. *Miller,* 25 Mich. 274.

But the facts in the case before us were such as to make the latter part of the instruction totally inapplicable, and, therefore, calculated to mislead the jury. There is no dispute about the facts that the appellee was an active, spry man, having ability to move and walk around with ease, and that there was nothing to hinder him from quickly stepping off the track when on it.   In such a case the following instruction was held by this court to correctly state the law:   "Though a railroad company and the public have equal rights at the intersection of the track of the former with a public highway, those operating a train upon the railroad are under no obligations to slacken the speed of such train, or to bring the same to a stop, when they notice a person crossing, or about to cross the track at its intersection with the highway, but they may presume that such person will himself take all proper precautions to avoid injury."

The same rule was declared by this court in *Chicago, etc., R. R. Co.* v. *Boggs,* 101 Ind. 522 (51 Am. Rep. 761); *Louisville, etc., R. R. Co.* v. *Philips, supra.*

VOL. 143—30

Though the instruction now before us be ever so correct as an abstract proposition of law which we need not and do not decide, yet it being wholly inapplicable to the evidence, its tendency could only be to mislead the jury. They were justified in believing from that instruction that the law made the appellant guilty of negligence for its failure to stop the engine long enough to allow the appellee to pass over the crossing in safety. It has been generally held by this court to be erroneous to give instructions to the jury not applicable to the case proven by the evidence. *Hill* v. *Newman*, 47 Ind. 187; *McMahon* v. *Flanders*, 64 Ind. 334; *Moore* v. *State*, 65 Ind. 382; *Nicklaus* v. *Burns*, 75 Ind. 93; *Summerlot* v. *Hamilton*, 121 Ind. 87; *Hays* v. *Hynds*, 28 Ind. 531. There are cases where from the record it appears that such instructions were harmless and therefore held not reversible error. But it does not so appear in this case. In *Nicklaus* v. *Burns, supra*, this court said: "After the evidence has been heard and argument of counsel had, for the court to instruct the jury upon a state of facts not embraced in the evidence, nor discussed by counsel, is asking them to decide questions which have not been submitted to them for trial. Jurors are liable enough to consider matters outside of the evidence, without being led off in that direction by instructions from the court. Such practice is well calculated to confuse and mislead the jury." And in *Hays* v. *Hynds, supra*, this court said: "Instructions should be pertinent to the case. Juries are apt to assume, and are justified in assuming, that they are applicable. This could only be so upon the ground that Alexander, acting as a pork dealer, was doing business for the bank, and unless the jury utterly disregarded the instruction, it could scarcely fail to mislead them." And the same is true in the case now before us. To

the same effect are *McKeen* v. *Porter*, 134 Ind. 483; *Shirk* v. *Mitchell*, 137 Ind. 185; *Blough* v. *Parry*, (Ind.) 40 N. E. Rep. 70.

The court erred in overruling the motion for a new trial.

The judgment is reversed with instructions to sustain the motion for a new trial and for further proceedings in accordance with this opinion.

Filed September 27, 1895, petition for rehearing overruled January 24, 1896.