THE WABASH PAPER COMPANY *v.* WEBB.

[No. 17,807.   Filed December 1, 1896.]

| 146 | 303 |
| 148 | 121 |
| 152 | 598 |
| 146 | 303 |
| 163 | 356 |

APPEAL AND ERROR.—*Bill of Exceptions.—Entry.*—Where the court entry showing the filing of the bill of exceptions erroneously refers to the bill as appellant's "longhand transcript of the evidence," such unnecessary words may be rejected as surplusage.

BILL OF EXCEPTIONS.—*Filed in Open Court.*—The filing of a bill of exceptions with the clerk in open court is equivalent to a filing in the clerk's office.

MASTER AND SERVANT.—*Negligence of Servant.*—A servant nineteen years of age, active and intelligent, is guilty of negligence in stepping over a revolving shaft projecting fourteen inches above the floor, containing projecting oil cups and set screws, instead of passing out by either of two other ways which were generally used, and were comparatively safe, although he testified that he was unaware of the presence of the set screw or oil cup, where the evidence showed that he had for nearly two-years worked in the mill, and for three weeks in and about this particular machinery, oiling the shaft at the point where he was hurt.

SAME.—*Assumed Hazards.*—Where a paper mill and machinery was constructed and maintained after approved plans, although

the gearings, set screws, pulleys, belts, and other exposed parts of machinery might be rendered more safe ·by being boxed, such extraordinary care cannot be required, and the usual and ordinary risks attendant upon work about such machinery are hazards of the service which are assumed by the employe.

From the Grant Circuit Court. *Reversed.*

*O. H. Bogue, W. G. Sayre* and *Brownlee & Paulus,* for appellant.

*A. E. Steele, Alvah Taylor* and *Pettit & Stitt,* for appellee. .

HOWARD, J.—Appellee was injured in the paper mill of appellant, his employer, and thereupon brought this action for damages, alleging that his in-‑ jury was caused by the negligence of appellant. In appealing from the judgment rendered in favor of appellee, appellant assigns as error: (1) The insufficiency of the complaint; (2) the overruling of the motion for judgment on the answers to interrogatories; and (3) the overruling of the motion for a new trial.

We have read the complaint and find it carefully drawn, and not subject to the criticisms urged against it by appellant. Neither do we think the court erred in overruling the motion for judgment on the answers to interrogatories, notwithstanding the general verdict. The facts found specially, while perhaps not of themselves sufficient to authorize a judgment in favor of appellee, yet, taken as they must be without intendment, do not seem to be in irreconcilable conflict with the general verdict.

Appellee objects to our consideration of the bill of exceptions containing the evidence, as not being in the record. There is a court entry showing the filing of the bill in open court. This entry erroneously refers to the bill as appellant's "longhand transcript of the evidence," whatever may be meant by that phrase.

The Wabash Paper Company v. Webb.

The paper so filed, however, is also, and properly, styled appellant's bill of exceptions; and an examination of the paper shows it to be, in due form, such a bill, containing, incorporated therein, the longhand manuscript of the evidence taken at the trial. The unnecessary words in the court entry may be rejected as surplusage. Because the bill was filed in open court it does not follow that it was not filed in the clerk's office, as required by law. The filing with the clerk in open court is equivalent to a filing in the clerk's office. There is also some irregularity in the clerk's certificates as to the filing of the longhand manuscript of the evidence and its incorporation in the bill; but it is sufficiently shown, as we think, that the manuscript was first filed in the clerk's office and then incorporated in the bill of exceptions before the bill was presented to the judge, and that the bill was presented to the judge within the time limited and was itself then filed. This is all that is required.

From the evidence, it appears that the accident to appellee occurred at about 6 o'clock on the evening of November 7, 1892. Appellee was then nearly nineteen years of age, active and intelligent for his age, and with good eyesight and hearing. He understood his work well, had been engaged in the appellant's paper mill for a year and nine months, and in the room where he was hurt for three weeks previous thereto. The mill ran night and day, one set of hands working for a week during the day and another for the same time during the night, after which they changed places during the next week, and so on. Appellee had worked in the room where he was injured for two weeks during the day and for one week during the night, and at the time of the accident was about to begin his second week's night work. The room where he worked was well

lit by electricity during the night, and was so lit when his injury occurred. He was the "third man," being next under the tender and back-tender. Among his duties were "to do the oiling and cleaning up." He was "general roustabout about the machine," and oiled the machinery every day or night when he was working.

After coming into the room on the evening in question he hung up his coat and hat, and with another young man stood for a short time talking to several girls who were at work. He had not yet put on his overalls when the tender called him to assist in guiding a sheet of finished paper from the "reel" to the "cutter." These machines stand one in front of the other, with an open space between them of $26\frac{1}{2}$ inches, through which the running sheet of paper passes from the rolls, to be cut into such sizes as desired. The paper runs two feet above the floor at one of the machines and four feet at the other. The evidence is conflicting as to whether the sheet sagged in the open space on this occasion; it usually sagged when first connected with the cutter, and then ran "taut." When appellee was called to assist in guiding the paper to the cutter at this time, he stood inside, or on the east of the machines, and took one edge of the paper in his hands, while the tender stood on the west or front side and held the other edge. The paper was several feet in width, and they held it until it was caught by the cutter, after which it ran automatically. Appellee was then to leave his place and come back to the front, or west side, of the machines. The usual way of returning was to stoop under the running paper and pass back by the open space between the machines. One could also reach the front by passing out to the east and around north of the cutter. To go this way he would have to first pass through a ten-inch space, be-

tween a pulley on the north and a shaft-support on the south. He would then be in a small square with shafting and other machinery on every side. Out of this square the exit that seems to have been provided by appellant was to the southeast, between two stands or supports, at right angles to each other, on the one of which rested the end of the "reel" shaft and on the other the end of the shaft that turned the "cutter." This space was nineteen inches in width. The cutter shaft was connected at its north end, at right angles, by fourteen-inch gearing, with the shaft which directly operated the cutter. Near to the gearing, on a "friction clutch" over the cutter shaft was an oil cup, and about one-fourth the way around the clutch from the oil cup was a set screw to hold the clutch close to the shaft. When the machinery was in motion the cutter shaft made from 65 to 100 revolutions in a minute. The evidence is again in conflict as to whether the oil cup and set screw could be seen when the shaft was so revolving. The cup and the screw each projected from the clutch about an inch and three-quarters.

Appellee, when passing out to go around to the front, did not return west under the running paper, but went east. He did not, however, go out by the exit to the southeast. He says the floor there was slippery with oil. He started to go out across the cutter shaft, near the clutch and gearing; and there he fell over, his left leg striking between the gearings, by which it was crushed and torn. The shaft and clutch over which he attempted to step were about fourteen inches high; and, to get over, one "would have to step about fourteen or fifteen inches high, and maybe between two and a half and three feet in length." His testimony is that he was thrown upon the gearing by having his clothing, near his left foot, caught by the oil cup and the set screw. He says he did not see

either the cup or the screw, that these could not be seen when the shaft was revolving, that the shaft was always revolving when he saw it, and that he had no knowledge of the existence of either the cup or the screw. He admits that he was constantly about this machinery during the time his work was on, that it was his duty to oil it and clean it; that he had oiled this shaft close up to the clutch, "just as close as he could get at it." But he says that for the reason that the shaft was in motion he never saw the cup or screw. He knew that set screws and oil cups are found on revolving shafts, and that it is dangerous to step over them. He had often passed from the rear to the front of the machines, going directly under the running paper, or by the exit between the ends of the shafts of the two machines. The reason that he gives for not going under the paper on this occasion is that the paper was sagged to the floor. It appears, however, that in such a case the paper could be raised up by hand and one could thus pass under; and this seems to have been the usual way. The reason given for not passing out by the open ninteen-inch exit, as already suggested, is that once before he had slipped on the oiled floor going that way, and he feared that now he might fall against the pulley near the end of the cutter shaft. Other witnesses did not find this way at all dangerous. Besides, it was one of appellee's duties to keep the floor clean of oil.

It is not doubted that, without regard to the presence of the oil cup and set screw, the attempt to pass over the revolving shaft, fourteen inches above the floor, especially so near to the clutch and gearing, was hazardous; and it is the theory of the appellant that in attempting this high and long step, the appellee missed his footing and was so thrown into the gearing. Whether this be correct, or whether, as the jury found,

the accident was caused by his clothing being caught by the oil cup and set screw, still the exit chosen by him over the turning shaft and near to the gearing seems to have been a very dangerous one. The evidence shows that it was a rare thing for any one to go out that way. Whether his duty required him to hurry about is not clear from the evidence. But even if it did, that would not justify him in taking this hazardous route, when, even if the paper were sagged, by waiting a moment the sag would have been taken up; or he might lift it as others did, and thus certainly pass back in safety by the way he came, to say nothing of going by the open nineteen-inch passage.

But, even granting all that appellee contends for— that the nineteen-inch exit was dangerous by reason of the oily floor; that the sagged paper obstructed the return by the way he came; and that he did not see and did not know of the presence of the oil cup and set screw—still we do not think that he has shown himself free from negligence. He was almost a man of full age, was bright, active and intelligent, had worked in this mill for nearly two years, and in and about this particular machinery for three weeks, oiling even the very shaft and clutch at the point where he was hurt. He knew, as he says, of the danger of stepping over projecting oil cups and set screws on revolving shafts. We think, consequently, that if he did not see or know of the cup and screw, which he claims caused his injury, he ought to have seen them and known of them. *Lake Erie, etc., R. R. Co.* v. *Stick*, 143 Ind. 449.

Witness after witness testified that the cup and screw could be seen by any one who looked at the place they were. We do not think he could work right there for three weeks, even oiling at the very place, without seeing them. It rather seems probable, as one or two witnesses testify, that he was in a hurry to

get around to continue his conversation with those with whom he had been talking when called by the tender to assist in running the paper from the reel to the cutter.

Besides, we are unable to see from the evidence adduced that the appellant was in any way at fault. The jury find, as the evidence also shows, that the paper mill and machinery were constructed and maintained after approved plans, of good pattern and design, of good material, adapted to the use for which they were intended, and such as are in use in the best paper mills. It is possible that gearings, set screws, pulleys, belts and other such exposed parts of machinery might be rendered more safe by being boxed. But well conducted mills are operated without this extra care; and if usual and ordinary care is shown in the procurement and maintenance of machinery, that is all that can be asked. Extraordinary care cannot be demanded; and the usual and ordinary risks attendant upon work about such machinery are hazards of the service which are assumed by the employe. And if it be conceded that the oil cup and set screw could not be seen when the shaft was in motion, yet we can not for that reason say that such necessary and usual attachments constitute a hidden defect to one who for nearly two years has been an employe in the paper mill where they are found, and who for three weeks has been engaged in the very room where they are used, constantly working around, oiling and cleaning the very machinery to which they are attached.

The evidence adduced on the trial was not, as we think, sufficient to support the essential allegations of the complaint, and hence not sufficient to sustain the verdict.

Judgment reversed, with instructions to grant a new trial.