## HOLLIDAY *v.* GARDNER.

[No. 3,301.  Filed Feb. 22, 1901.  Rehearing denied June 27, 1901.]

NEGLIGENCE.—*Runaway Team.*—*Collision.*—In an action for damages resulting from a collision with a runaway team, the evidence showed that the runaway horses were carefully hitched to a carriage, and carefully driven by defendant's servant; that the harness was good; that the horses became frightened, and ran away without any negligence on the part of the driver who did all in his power to stop them; that at a street crossing the team collided with plaintiff's horse which was hitched to a buggy, and was being driven along a cross street; that, when the runaway horses were stopped a short distance beyond the crossing, the driver remarked that he was glad that he struck the horse, otherwise he did not know what would have happened. *Held,* that the evidence was insufficient to show negligence on the part of plaintiff or his servant.

From Marion Superior Court; *Vinson Carter,* Judge.

Action by Charles J. Gardner against William J. Holliday to recover damages caused by a runaway team. From a judgment for plaintiff, defendant appeals. *Reversed.*

*O. B. Jameson* and *F. A. Joss,* for appellant.
*R. W. McBride* and *C. S. Denny,* for appellee.

HENLEY, C. J.—On the 10th day of March, 1898, at about the hour of 12 m., one Robert Ryan, appellant's servant employed by him to drive his team of horses, was driving said team, harnessed and hitched to an open two-seated carriage, upon the streets of the city of Indianapolis. Two ladies, members of appellant's family, were seated in the back seat of the carriage. They were the only occupants. At the time of the happening of the particular incidents out of which this controversy arose, the team of horses was being driven north on Meridian street in said city. The team had been driven as far north as the intersection of Vermont street, about opposite the building known as the Blacherne, when the horses became scared and unmanageable and ran away. After running about two squares one of the tugs came loose. The rapid motion of the horses caused the tug to be thrown first in one way and then in another, striking and hitting the horses on the legs and bellies. The horses continued to run north on the east side of Meridian street, the driver using every effort in his power to stop them but without any success. He succeeded in so guiding the team as to avoid all collisions until he came to the intersection of Sixteenth street. Appellee's son was coming from the east on Sixteenth street driving one horse harnessed and hitched to a top buggy. Appellee's son either did not see the runaway team approaching the Sixteenth street crossing, or was unable to pull up his horse in time to avoid the collision after he saw it. The pole of appellant's carriage struck appellee's horse on the neck, knocking the horse down and slightly injuring it. As a result also of the collision one of appellant's horses was thrown and the team brought to a standstill within a short distance of the Sixteenth street crossing. This action was commenced by appellee to recover damages sustained by him growing out of the collision as above detailed. The itemized bill of damages filed with the complaint was as follows:

Holliday ·v. Gardner.

"William J. Holliday, To Charles J. Gardner, Dr.

| | |
|---|---|
| Bill of Schweikle & Prange for repairs to broken buggy .................. | $ 4.75 |
| Bill of Drs. Pritchard & Son, V. S., treating injuries to horse .............. | 6.50 |
| Loss of use of injured horse for eighteen days.  Loss of use of buggy...days.. | 18.00 |
| For permanent injuries and damages to horse ......................... | 25.00 |
| Total .........................$54.25" |

The complaint does not attempt to set out specifically the negligent acts of appellant which caused the injury.   The averments of the complaint in this respect are general and are in the following words:  "Plaintiff avers that said damages were the result of the careless and negligent conduct of said defendant, his servants and employes, committed on the.....day of March, 1898, and were caused without any fault or negligence of this plaintiff in anywise contributing thereto."   The complaint is not attacked by motion to make more specific, or by demurrer.   The cause was submitted to a jury for trial.   The trial resulted in a verdict in favor of appellee, and over appellant's motion for a new trial judgment was rendered in appellee's favor.

The alleged errors of the court in refusing to instruct the jury to find for the appellant, and the insufficiency of the evidence to sustain the verdict are discussed together under the specification of the assignment of errors that the lower court erred in overruling the appellant's motion for a new trial.

The general verdict of the jury was a finding in appellee's favor upon every material allegation of his complaint.   A general verdict is not helped by special findings of facts.   It needs nothing of the kind.   What the general verdict needs, and all it needs, is some evidence supporting each material

averment, the truth of which it affirms.  What the jury may have found in answer to interrogatories as to the existence of certain facts cannot enlarge the scope or effect of the evidence.  It is for the court to say from the evidence whether or not it sustains the verdict.  It was necessary in this case that the appellee offer evidence to prove (1) the amount of damage he had sustained; (2) that the damage was caused "by the careless and negligent conduct of said defendant, his servants and employes," and (3) that the said damage was solely caused without any fault or negligence of appellee.

Admitting that the first proposition was established, and admitting for the purposes of this case that the third proposition was also proved, we come then to the second proposition, which represents all there is in the case.  It is presented in three different ways, but it remains the same question.  It is this: Is there any evidence to sustain the general verdict upon the question of appellant's negligence?

Four witnesses testified on behalf of appellee, they being Charles J. Gardner (appellee), J. E. Pritchard, the attending veterinary surgeon, William E. Gardner, a son of appellee and the driver of the injured horse, and Charles F. Weaver, who saw the accident.  The evidence of appellee Charles J. Gardner only went to the character of the injury done his property, and the resulting damage therefrom.  The evidence of Dr. Pritchard was only as to the extent and effect of the injuries received by appellee's horse.  The next witness called was William C. Gardner, the young man who was driving the injured horse and who is appellee's son.  He testified in substance as follows:  That he was driving west on Sixteenth street, that he first saw the running horses coming when his horse's head was on a line with the east curb of Meridian street, the runaway team were then moving very rapidly and were running on the east side of Meridian street and about five feet from the east curb.

Holliday *v.* Gardner.

Witness, who was driving in a brisk trot, tried to stop his horse, using every effort to avoid a collision, and had stopped his horse when he was struck by the pole of the carriage drawn by the running horses. His horse was struck between the shoulder and neck and was knocked down. Witness said that it seemed like the driver of the runaway team "pulled the horses right toward my horse." One of the running horses was knocked down by the collision and the team was soon stopped. They had passed a few feet beyond Sixteenth street when they were finally stopped. Witness also testified that he asked the driver of the runaway team whose rig it was, and that the driver answered that he did not know, and that the driver also said: "If it had not been that I had run into you I don't know where I would have went." The next and last witness called by appellee was Charles F. Weaver, a solicitor and collector for Nelson Morris & Company. Weaver was in a single rig driving a good horse; he saw the runaway team as they crossed New York street and started after them, and was able to keep within fifty to seventy-five yards of them. He testified that at the time of the collision he was within about fifty yards of the team; that the team was five or six feet from the east curb of Meridian street when it passed onto Sixteenth street; that he did not see young Gardner and his rig until after the team struck his horse. The runaway team veered to the east as they got into Sixteenth street and I thought the driver was trying to turn them into that street. At the time of the collision the Gardner horse was out into Meridian street as far as the length of the horse. I got to Gardner's horse before it got up. Appellant's driver, who was a colored man, was considerably frightened. Young Gardner asked him who this team belonged to and the driver said he did not know who it belonged to, that he was glad he struck the horse; it was no telling where he would have stopped.

Taking the evidence of appellee's witnesses as a guide, we make the following diagram of the situation:

a.  Point of collision.  b.  Point where appellant's team stopped.  Dotted line, course taken by team.  Solid line, course taken by Gardner.

The actionable negligence of appellant in this matter must have been either that he permitted horses known to be un-manageable to be driven upon the street, or that they were improperly and negligently harnessed or hitched, or im-properly and negligently driven either at the time they became scared and unmanageable or at the time the injury occurred.  If appellant's servant was negligent, of what did such negligence consist?  What duty owing to appellee has

been violated ? The evidence shows that the horses were carefully hitched and carefully driven; that the harness was good; that the horses became frightened and ran away without any negligence on the part of the driver; that the driver did all in his power to stop them and guided them on the proper side of a much traveled street near the curb, without striking any one until appellee's horse and vehicle came out from a side street directly in front of appellant's running team.

*Negligence must have a foundation in fact.* And this is true whether it be a court or jury that arrives at the conclusion. *Wabash, etc., R. Co.* v. *Locke,* 112 Ind. 404, 421, 2 Am. St. 193.

We are unable to find in the evidence adduced a single word which would tend to prove the negligence alleged in appellee's complaint. The fact that appellant's driver may have said that he was glad he struck the horse, that if he had not there would have been no telling where he would have stopped, has not, in our opinion, the remotest connection with, or any tendency to prove, negligence upon the part of appellant. It is hard to surmise what lies at the other end of the road to a man and two women behind a pair of frightened, unmanageable, and running horses. Who would not be glad that something happened to stop them ? And was it any wonder when the driver saw that no human life had been sacrificed, no person injured in body or limb, that the only injury was to the horses and the vehicles, that he said he was glad he ran into the horse. But counsel for appellee contend that their case is strengthened by the evidence produced by appellant. With this contention we can not agree. The driver was the only witness who testified concerning the start of the running. His evidence did not in any part tend to charge appellant with negligence. The evidence of appellant's witnesses and the physical facts show plainly to our minds that the young man, Gardner, must have been guilty of contributory negligence, but upon this issue there is a

conflict. The weight of the evidence is for the trial court, and where the verdict of the jury is plainly contrary to the preponderance of the evidence it is the duty of the trial court to grant a new trial. *Lake Erie, etc., R. Co.* v. *Stick,* 143 Ind. 449. The sufficiency of the evidence to sustain the verdict will always be considered by the Appellate Court. *Lake Erie, etc., R. Co.* v. *Stick, supra; Wabash Paper Co.* v. *Webb,* 146 Ind. 303; *Habbe* v. *Viele,* 148 Ind. 116.

The very best showing possible for appellee, under the evidence, is that the collision was purely accidental, and in such a case there can be no recovery because no blame can attach to anyone. See *Ervin* v. *Evans,* 24 Ind. App. 335; *Wabash, etc., R. Co.* v. *Locke,* 112 Ind. 404.

Appellant, when appellee had rested his case, interposed a motion to instruct the jury to find for defendant; this motion the court overruled. After all the evidence was in, and the case closed, appellant again moved the court to instruct the jury to return a verdict for appellant. This motion the court overruled, and in doing so committed reversible error. Appellee had failed to produce evidence proving or tending to prove a material part of his cause of action.

The insufficiency of the evidence was first brought to the attention of the trial court by the motion to instruct the jury to return a verdict for appellant. The same question was presented by the motion for a new trial, which was overruled. For the error in overruling the motion for a new trial, the judgment is reversed.

Judgment reversed, with instructions to the lower court to sustain appellant's motion for a new trial.

Black, J., took no part.

### DISSENTING OPINION ON PETITION FOR REHEARING.

Roby, J.—The record herein furnishes a very excellent illustration of the wisdom of the rule long established in this State, which leaves the decision of questions of fact with the jury to whom the cause is submitted in the trial court. Two

members of this court have attentively read the evidence, and have reached different conclusions. Neither of them had the opportunity of observing the witnesses and applying to their testimony the tests of credibility which men use when the truth is desired.

The son of the appellee was driving west along Sixteenth street in Indianapolis with one horse and a single buggy. At the intersection of Sixteenth and Meridian streets, the horse, which belonged to appellee, was struck by a runaway team owned by appellant, and injured. To recover damages for such injuries, suit was brought in a justice court and a jury trial had, resulting in a verdict for appellee. An appeal was taken to the superior court of Marion county, and again tried before a jury, which returned a verdict for appellee for $54.25. From a judgment on the verdict, this appeal is taken.

There is no evidence tending to show that appellee's son was guilty of contributory negligence. He was driving along the street in a usual and proper manner and was struck by a runaway team coming down the intersecting street. It is established by the testimony of all the witnesses that as soon as he discovered the danger he stopped his horse, and did what he could to escape the collision. The rule applicable to accidents at railway crossings has, for obvious reasons, no application. *Scofield* v. *Myers, post,* 375.

The more serious question arises in regard to the appellant's alleged negligence. It is conceded in the briefs that there can be no recovery unless the evidence shows that the appellant's driver, in the management of the horses, either did something that he ought not to have done, or left undone something that he ought to have done under the circumstances. Why the horses became frightened is not shown. The driver gives no explanation. While being cross-examined he was asked: "What started those horses? A. I could not say." This comes far short of an explanation, while if the appearance of the witness was not greatly in

his favor, the jury might, so far as can be determined from the record, have properly refused to believe him. The appellant's wife and another lady were in the carriage at the time, but they were not called as witnesses.

The appellee's horse, when struck, was "right on a line with the curb", "the east curb of Meridian street." The driver of appellee's horse testified: "When I saw him, it seemed like he pulled the horses right toward my horse." Mr. Weaver, a wholly disinterested witness, testified in part as follows: "What did you observe in reference to the direction the runaway team was going at the time it reached Sixteenth street, and from that on until it struck the horse driven by young Mr. Gardner? A. I thought he was trying to head them east. Q. Into Sixteenth street? A. Yes, sir. Q. Did they veer to the eastward as they got into Sixteenth street? A. Yes, sir."

Immediately after the collision, young Gardner asked appellant's driver "who the team belonged to." He said he could not say, he "did not know who it belonged to". Appellant's driver also said that he was "glad he struck the horse. It was no telling when he would have stopped." Appellant's driver testified that he was perfectly calm when the collision occurred, and not scared, and that he "pulled" the team "a little to the left."

The position of Gardner's horse, as shown by some of the evidence, is such as to have rendered it impossible for the collision to have occurred except by the swerving to the right of the runaway team. If the jury, after seeing the parties to the occurrence on the witness stand, and hearing all the evidence, concluded that the driver of appellant's team did pull them into Sixteenth street and against appellee's horse, or if they believed that he did not use reasonable effort to pull them away from it, the verdict was right.

The driver, Ryan, stated that the horses started from New York street or Vermont street; that they ran north; that he tried to stop them by see-sawing on them; that it did no good; that he pulled them back against the dashboard,

and then they would kick; that all he could then do was to
let them go and keep them in the road as much as he could;
that one of the tugs came loose and struck the horse around
the legs and under the belly; that he did not notice whether
the leather holding the tug was broken or not; that he always
fastened it on when he hitched up; that he did not strike the
horse with the whip in starting; that he had not so stated;
that the horses had run about two squares before the tug
came loose; that the tug was pushed off by the hind-quar-
ters of the near horse. The witness further testified as
follows: "Q. They were pretty skittish horses to manage,
wern't they? A. I don't know. One of them was con-
sidered that way but the other was all right. Q. One was
considered quite skittish? A. He is high spirited was all.
Q. That is the horse that got the tug loose? A. Yes sir."

Appellee insists that the fact that the horses were running
away raised a presumption of negligence against the owner.
A forceful statement of the position was made by the su-
preme court of California, as follows: "The question at issue
became narrowed down to the point whether Jones, who had
charge of the cattle, and the persons assisting him, were
guilty of negligence and want of due care in driving the
cattle from the place where they landed to the slaughter-
house at the outskirts of the city, and also in their endeavor
to capture the steer after he became separated from the
herd. * * * The burden was on the plaintiff to prove,
in the first place, that he received the injury for which he
sought redress, and that such injury was done by the animal
of the defendants described in the complaint, within the
city of San Francisco, and that it happened without fault on
his part. These facts proved, afford *prima facie* evidence
of negligence on the part of the defendants, and then the
burden of proof became cast on them to show that the injury
did not occur by reason of any default on their part."
*Ficken* v. *Jones*, 28 Cal. 618; *Gannon* v. *Wilson* (Pa.), 5
Atl. 381; *Hummel* v. *Wester*, Brightly 133.

In *Gray* v. *Tompkins,* 40 N. Y. St. 546, it is held that the mere fact that a team of runaway horses collided with plaintiff's horse and vehicle did not, in the absence of any evidence of negligence, either at the time the horses ran away or thereafter, raise any presumption of negligence.

In *Gottwald* v. *Bernheimer,* 6 Daly 212, it is held that the mere fact that a team of horses attached to defendant's wagon ran away and injured plaintiff proves no wrongful act of the defendant. To the same effect are the following cases: *Quinlan* v. *Sixth Ave. R. Co.,* 4 Daly 487; *Sullivan* v. *Scripture,* 85 Mass. 564.

The better reason is with the last cited authorities. Negligence being alleged must be proved, and no presumption of law arises to take the place of proof. The true rule relative to the matter is stated by the supreme court of Connecticut: "There is no rule of law that shifts the burden of proof upon the defendant; that where the neglect of the defendant to explain the facts which indicate his negligence operates to strengthen inference of negligence, it does so wholly as a matter of evidence, producing its effect in the ordinary manner on the judgment of the jury, and not by any superadded force of law; that the cases where the proof on the part of the plaintiff of the damage done him by the defendant is enough to make a *prima facie* case of negligence on the part of the defendant, are cases where the act causing the damage was of a nature to indicate negligence, and this as the act addresses itself to the judgment of the jury on this point, and is distinguishable by their judgment from an act which does not indicate negligence, they judging for themselves of the character of the act in this respect." *Button* v. *Frink,* 51 Conn. 342, 351, 50 Am. Rep. 24.

" 'There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care, it affords reasonable evi-

dence, in the absence of explanation by the defendants, that the accident arose from want of care.' This statement of doctrine has met with judicial approval in many subsequent cases: Bovill, C. J., in *Czech* v. *General Steam Nav. Co.,* L. R. 3 C. P. 14, 18; *Transportation Co.* v. *Downer,* 11 Wall. 129, 134, 20 L. Ed. 160; *Dougherty* v. *Missouri Pacific Railroad,* 9 Mo. App. 478, 485." *Hill* v. *Scott,* 38 Mo. App. 370, 374.

The failure of appellant to explain the cause of the horses' running away was a proper matter for the jury to consider in connection with the statement of the driver to the effect that one of the horses was all right, and the fact of the runaway.

" 'Now, it is a well settled rule of evidence that when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would support, the inferences against him; and the jury is justified in acting upon that conclusion. "It is certainly a maxim" said Lord Mansfield "that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted." *Blatch* v. *Archer,* 1 Cowp. 63, 65. It is said by Mr. Starkie, in his work on evidence (Vol. 1, p. 54): "The conduct of the party in omitting to produce that evidence in elucidation of the subject-matter in dispute which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice." ' " *Pacific Coast, etc., Co.* v. *Bancroft-Whitney Co.,* 94 Fed. 180, 198, 36 C. C. A. 135; *Gulf, etc., R. Co.* v. *Ellis,* 54 Fed. 481, 4 C. C. A. 454; *Hart* v. *Washington Park Club,* 157 Ill. 9, 41 N. E. 620, 29 L. R. A. 492, and authorities cited pp. 494-5.

Holliday *v.* Gardner.

It therefore follows that the fact that the appellant's team was running away, and that no explanation or an insufficient explanation was made as to the occasion of their so doing were proper facts for the jury to consider, together with any other relevant facts, upon the question of negligence in allowing them to do so. It is not necessary to say what weight any circumstances shall have. That was for the jury; and when we have determined that evidence sufficient to justify an inference of negligence in allowing the horses to run away, or in failing to prevent the collision, was introduced at the trial, the duty of this court is clear. It has so often been expressed that citation of authority is superfluous. It was expressed by the Supreme Court in a case of very great importance as follows: "But it is the province of the jury to determine such disputes and controversies, and if they err therein it is a mistake of fact and not of law. The only remedy for the correction of such a mistake is an application to the trial judge for a new trial. If he overrules such motion, the presumption is that he did his duty and that the jury had not made any mistake of fact. *Cincinnati, etc., R. Co.* v. *Madden,* 134 Ind. 462; *Deal* v. *State,* 140 Ind. 354;" *Hinshaw* v. *State,* 147 Ind. 334-353, 354.

An earlier case decided by the Supreme Court is sometimes cited as having overthrown the rule. *Lake Erie, etc., R. Co.* v. *Stick,* 143 Ind. 449, 465. Such is not the fact. All that was decided in that case is that there was no evidence before the jury tending to exonerate the plaintiff from contributory negligence. The writer of the opinion inserted some general views of his own, reflecting upon the integrity of the circuit judges of the State; but that question not having been presented, it must still be presumed that for his own acts performed under the obligation of an oath every man answers primarily to his own conscience. The merits of the case were presented to the jury. *Whitesides* v. *Hunt,* 97 Ind. 191, 210, 49 Am. Rep. 441, and its verdict ought to be respected. I therefore think the petition for a rehearing should be granted.