WINKLER, Respondent, vs. POWER & MINING MACHINERY COMPANY, Appellant.

*December 8, 1909—January 11, 1910.*

*Master and servant: Injury from defective appliance: Evidence: Contradiction of physical laws: Questions for jury: Appeal: Presumptions in support of verdict: Negligence of master: Common usage: Special verdict: Separate question as to assumption of risk: Request: Opinions.*

1. The proposition that testimony as to the manner in which an injury was inflicted is in contradiction of known physical laws and therefore impossible and incredible must be supported by demonstration, not by mere conflict of evidence; and all the necessary data for demonstration must appear affirmatively and not depend upon mere credibility of other witnesses.
2. In an action for personal injuries caused by the spilling of molten iron from a crane ladle in defendant's foundry, the evidence is *held* not to furnish data sufficient to demonstrate that the injury could not possibly have happened in the manner testified to on the part of plaintiff; and the question whether it did so happen was one for the jury.

3. If necessary to support the verdict, it will be presumed on appeal that the jury were satisfied of the existence of a fact properly before them for determination.

4. In an action for personal injuries to an employee caused by the spilling of molten iron from a crane ladle in defendant's foundry, the fact that the ladle was in substantially as safe condition as similar ladles used in such foundries generally is competent and proper to be considered upon the question of whether defendant exercised ordinary care in furnishing such appliance for use by its employees, but is not conclusive upon that question, as the appliance, though in common use, might be inherently, and to the employer obviously, dangerous.

5. The master cannot escape liability for injuries caused by his failure to exercise ordinary care to furnish his servants reasonably safe appliances by proving that all other masters in the same line of business and using the same appliances are equally negligent.

6. Although the question of plaintiff's assumption of the risk should properly have been submitted for special verdict separate from the question of his contributory negligence, a failure so to submit it cannot be assigned as error by defendant, where he did not present a question properly covering the matter and the verdict as found did in legal effect cover it.

7. A question which the court was asked to submit 'or special verdict, "Was the spilling of molten iron which caused plaintiff's injuries a common occurrence in the business of molding and one incident to plaintiff's work as a bench molder in defendant's foundry?" did not properly cover the question of plaintiff's assumption of the risk, since it did not embrace the question whether plaintiff knew, or in the exercise of ordinary care ought to have known, of such occurrences.

8. The opinion of a witness as to the extent to which certain gearing was worn two years before the time in question should have been excluded in the absence of data upon which to base it, there being no uniformity of progress in such wearing.

APPEAL from a judgment of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Doe & Ballhorn,* and oral argument by *J. B. Doe.* They cited, among other cases, *Phipps v. Wis. Cent. R. Co.* 133 Wis. 153, 113 N. W. 456; *Hamann v. Milwaukee B. Co.* 127 Wis. 550, 106 N. W. 1081; *Hennesey v. C. & N. W. R. Co.* 99 Wis. 109, 74 N. W. 554;

*Dugal v. Chippewa Falls,* 101 Wis. 533, 77 N. W. 878;
*Lounsbury v. Davis,* 124 Wis. 432, 102 N. W. 941; *Camp-shure v. Standard Mfg. Co.* 137 Wis. 155, 118 N. W. 633;
*Powell v. Ashland I. & S. Co.* 98 Wis. 35, 73 N. W. 573;
*Schmitt v. Hamilton Mfg. Co.* 135 Wis. 117, 115 N. W. 353.

For the respondent there was a brief by *Rubin & Zabel,* and oral argument by *W. B. Rubin.* Among other authorities, they cited *Ryan v. Oshkosh G. L. Co.* 138 Wis. 466, 120 N. W. 264; *Twentieth Cent. Co. v. Quilling,* 136 Wis. 481, 117 N. W. 1007; *Estey Organ Co. v. Lehman,* 132 Wis. 144, 111 N. W. 1097; *Finkelston v. C., M. & St. P. R. Co.* 94 Wis. 270, 68 N. W. 1005; *Duncan v. Grand Rapids,* 121 Wis. 626, 99 N. W. 317; *Davey v. Janesville,* 111 Wis. 628, 87 N. W. 813; *Fleming v. Northern T. P. M.* 135 Wis. 157, 114 N. W. 841; *Grant v. Keystone L. Co.* 119 Wis. 229, 96 N. W. 535; *Howard v. Beldenville L. Co.* 129 Wis. 98, 108 N. W. 48; *Castello v. Landwehr,* 28 Wis. 522; *Stucke v. M. & M. R. Co.* 9 Wis. 202; *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 80 N. W. 644; *Blankavag v. Badger B. & L. Co.* 136 Wis. 380, 117 N. W. 852; *Patnode v. Westenhaver,* 114 Wis. 460, 90 N. W. 467; *Hocking v. Windsor S. Co.* 125 Wis. 575, 104 N. W. 705; *Van de Bogart v. Marinette & M. P. Co.* 127 Wis. 104, 106 N. W. 805; *Guinard v. Knapp-Stout & Co. Co.* 95 Wis. 482, 70 N. W. 671.

TIMLIN, J.    The plaintiff in this case had a verdict which may be abbreviated as finding: (1) That he was burned by molten iron falling from a crane ladle in defendant's foundry on May 15, 1907.    (2) The apparatus controlling the movement of the crane ladle containing this molten iron was so worn and loose as not to be reasonably safe, etc.    (3) This unsafe condition of said apparatus was the proximate cause of the injury to plaintiff.    (4) The defendant knew of such unsafety in time to have prevented the injury by the exercise of ordinary care.    (5) The defendant also ought to have known,

etc.   (6) The plaintiff did not know prior to the injury that
said apparatus was not reasonably safe; (7) nor ought he to
have so known in the exercise of ordinary care.   (8) No
want of ordinary care on the part of Frank Miller, a co-em-
ployee, caused the injury.   (9) No want of ordinary care on
the part of the plaintiff.   (10) Plaintiff's damages, $2,000.

The appellant's counsel assigns numerous errors in the pro-
ceedings below, making his principal argument, however, on
the proposition that the testimony on the part of the plaintiff
relating to the manner in which his injury was inflicted is in
contradiction of known physical laws and therefore impossi-
ble and incredible.   This proposition must be supported by
demonstration, not by mere conflict of evidence, and in order
to present it properly all the necessary data for demonstration
must appear affirmatively and not depend upon mere credibil-
ity of other witnesses.   *Rasmussen v. Wis. T., L., H. & P.
Co.* 133 Wis. 205, 113 N. W. 453.   The evidence in this case
is very deficient in measurements and descriptions, but, sup-
plying defects in the testimony from an exhibit purporting to
be drawn to a uniform scale and weighing the facts thus as-
certained for the purpose of testing this question, we have the
following:

The crane ladle in question was a somewhat circular iron
bucket lined with fire brick and forty-three inches in height,
having an inside diameter at a point three inches below the
top of thirty-nine inches, an inside diameter at the bottom of
thirty-five inches, and an inside diameter near the center at
the point of suspension of thirty-seven inches.   It was sus-
pended on a movable crane by means of a chain hook engaging
at the apex of an arched handle somewhat similar to that of
an ordinary pail or bucket.   This handle arched over the top
and extended on the outside down the sides of the ladle or
bucket, and connected with the latter by means of two journals
protruding from the ladle and carried at exactly opposite
points in its circumference.   Each of these journals fitted

into journal boxes or sockets in the lower ends of this handle. The center line of suspension of this ladle or bucket in the lower extremities of said handle by means of said journals was twenty-one inches above the bottom of the ladle and twenty-two inches below the extreme top thereof. On the occasion in question the ladle was filled to within three or four inches of the top with melted iron. The ladle has a capacity of five tons of this melted iron, as we understand the evidence. Whether this was three or four inches below the top would be of paramount importance in any attempt at demonstration. We have no evidence showing, when the ladle is empty, the relative mass above and below the line of suspension. The diameter of the ladle increases toward the top, and there is one inch more in height of the ladle above the line of suspension, but there is the closed heavy lined bottom as against the open top. The top carries a lip or spout over which the metal pours, but the protrusion or projection or the dimensions of this lip or spout are not given. The lining of fire brick or fire clay which covers the inside of the bottom and sides thins off in a curve at the top and the measurements of this curve are not given. This lip and curve materially affect the tilting of the ladle by bringing the molten material farther off from the line of suspension as this heavy bottom affects it in a contrary direction by rising to and remaining at a distance from the line of suspension, while the liquid contents seek their level and flow away from the bottom. But from data collected from the drawings it is apparent that, assuming the ladle to be exactly circular and of the varying diameter stated, the cubic contents of the ladle, when filled to within three inches of the top, would be 23,604 inches above and 19,330 inches below the line of suspension. This would leave about fifty-five per cent. of the whole contents above the line of suspension. Without knowing what mass of the ladle itself was above and what below this line, the last figures are not available for purposes of demonstration.

One of the journals on which this ladle was swung extended through its socket or journal box in the lower extremity of the handle several inches. Upon this projection there was attached rigidly a cogwheel of about twenty inches diameter equipped on its periphery with worm cogs convex on their outer edge. On top of this twenty-inch wheel and tangent to its circumference and engaging with its cogs was a straight short bar carrying a spiral projection, which for convenience we will call the "screw." This screw was journaled at each end in journal boxes or sockets rigid upon the outside of the handle. On one end of this screw was a miter gear, and on a short shaft running at right angles with this screw and engaging with it at this end there was also a miter gear, and on the other or outside end of this short shaft was a hand wheel of about two feet in diameter. For the purpose of pouring out the molten contents of the ladle, the operator, by turning this hand wheel, imparted through the miter gearing a slow rotary motion to the screw. This last more slowly moved the rigid twenty-inch wheel, this tipping the ladle in the required direction and also holding it back from tipping over too rapidly. The spiral projection, or in other words the thread of the screw, did not fit closely between the cogs of the twenty-inch wheel, so that when the operator at the two-foot wheel began the operation of pouring out the melted iron, the ladle being then perpendicular or it might be slightly inclined in the opposite direction, he must first, by putting the screw in motion, bring the thread hard against that side of the cogs of the twenty-inch wheel opposite to the direction in which he intended to pour. This pressure would continue on that side of the cogs until the ladle had been so far tilted that the center of gravity of the ladle and its contents would fall on that side of the line of suspension toward which the pouring took place. At this point the ladle and its contents would take what the witnesses call a drop. That is, it would lurch in the said direction, changing the pressure of the screw thread against the

cogs of the twenty-inch wheel to the other side of such cogs, and holding back instead of pushing on these cogs. This would continue until so much of the contents had been poured out that the relative quantity remaining in the bottom of the ladle with the heavy bottom would again shift the center of gravity to the other side of the line of suspension, when the ladle would take a similar lurch but in the opposite direction from the first, and the operator would be again engaged as he began.

The defendant's witnesses agree with those of the plaintiff with respect to the existence of these two lurches, but plaintiff's witnesses say there were other intervening lurches, while this last is said to be impossible. Whether or not this is possible is not necessary to the determination of this case. It depends, however, upon many factors not shown by the evidence, principal among which is the rate at which the ladle is emptied and the continuity of the motion of tilting in one direction and the volume of bucket and contents above and that below the line of suspension and the oscillations of the swinging ladle. The extent of this lurch or drop is a matter upon which the evidence is widely divergent. There is competent evidence from both sides that the space between cogs on the twenty-inch wheel minus the thickness of the screw thread or spiral projection amounted to one eighth of an inch. The distance from the center of suspension to this contact as shown by the drawings is ten inches. The distance from the same center to the top of the bucket and ladle along the same line from the same data is twenty-two inches. Regarding the center of suspension as the center of a circle and the top of the ladle in its circumference, the mathematical formula would be: cos. : sin. $=$ r. : tan.; or $10 : .125 = 22 : .275$. From this cause alone the movement at the top of the ladle would be only slightly in excess of one fourth of an inch in a straight line. There is, however, in the record some testimony from the witness Gaertner in which he states that the distance from

the point of contact between the screw and the twenty-inch wheel to the trunion of the ladle is only nine and one-half inches and the distance from this trunion to the lip or spout of the ladle or bucket presumably along the same line is 33 inches. From this he gets the proportion $9\frac{1}{2} : \frac{1}{8} = 33 : 7\text{-}16$. But his basic figures conflict with the dimensions shown on the exhibit, and his proportion is not mathematically accurate. This witness further testifies that although there was only one eighth of an inch play between the cogs on the twenty-inch wheel and the spiral projection on the screw, yet, on account of some looseness in the journals, the whole movement at this point which he found was really one fourth of an inch. Here we find an omission in the evidence which forbids any accuracy approaching demonstration. There is no evidence from which we can ascertain the lateral movement of the screw in its journal boxes. Nothing to show what collars or shoulders it had, how near they were to the journal boxes on each side of the latter, and nothing to show the amount of play or looseness of the suspensory journals in the lower extremities of the handle. Consequently when an eyewitness states that the ladle lurched or dropped several inches, while we may suspect exaggeration, we cannot demonstrate his incorrectness. The total of looseness or play estimated by Gaertner would make the lurch at the top of the ladle, according to the scale of the exhibit, $10 : .25 = 22 : .55$, and according to Gaertner's data, $9.5 : .25 = 33 : .86$ plus. In either case there would be a considerable jar from a mass of five tons suspended as described falling this distance and then suddenly arrested. It must also be considered that this lurch or movement is in a circle around the line of suspension, passing through the lower extremities of the ladle handle. The top of the ladle lurches in the direction in which the iron is being poured, while the bottom of the ladle lurches back in the opposite direction. The impact is against the handle at the point where the journals of the screw are rigid thereon, and this handle is loose

at the chain hook above the point of impact and at the line of
suspension below the point of impact.     There must therefore
be at times a lurch of this swinging bucket much greater than
the measurements above given.     This would necessarily pro-
duce a wave and probably more than one wave of some height
in the liquid iron moving in the direction in which the iron
was being poured, and suddenly increasing the volume falling
over the lip or spout of the ladle.     Some of the witnesses de-
scribe this lurch or drop as much greater than above indicated.
We are unable to oppose mathematical verities or kinetic laws
to the testimony of Gaertner or to that of the other witnesses,
because we are left without any certain or reliable data upon
which to base our computations.     But it is argued that this
lurch in the direction in which the iron was being poured
could not have occurred more than once in the operation of
pouring and that at or near the time when the pouring began.
We find no sufficient data upon which counsel can affirm this
as a mathematical verity, although it seems quite probable.
But, as said, this presents an immaterial issue.     Although the
plaintiff testified in examination before trial that the lurch
and consequent spilling over of iron which caused his injury
occurred after a considerable quantity of the contents of the
ladle had been poured out, his testimony in chief at the trial,
as well as that of the witnesses Kaiser, Brember, and Schu-
macher, tends to show that the lurch, spill over, and injury to
the plaintiff occurred immediately after the operator began to
pour.     This was a question for the jury, and if they were sat-
isfied that the accident occurred at this stage of pouring, as
we must presume they were if that is necessary to uphold their
verdict, all conclusions based upon other premises vanish.
We are satisfied there was in the particulars covered a fair
question for the jury.     It is suggested that common sense is
sufficient to show the incredibility or impossibility of plaint-
iff's testimony.     What is thought to be common sense is fre-
quently nothing more than a fixed belief based on no evidence

and supported by no reasons, and it then ordinarily lacks the certainty requisite for the annihilation of positive evidence to the contrary.

The defendant asked the court to instruct the jury as follows:

"If you find that in furnishing the crane ladle in use at the time plaintiff was injured defendant exercised ordinary care to see that such ladle was in a reasonably safe condition—that is to say, in substantially as safe condition as similar ladles were, which were used in such foundries generally,—then the defendant discharged its duty toward the plaintiff, and your answer to the second question will be 'No.' "

This instruction is too absolute, and if given would take away from the jury their right to reject the test of common usage on the ground that such appliance in common use was itself inherently, and to the master obviously, dangerous. *Yazdzewski v. Barker,* 131 Wis. 494, 111 N. W. 689.

There is no rule of law which will enable a master to escape the consequences of failing to exercise ordinary care to furnish his servants reasonably safe appliances by proving that all other masters in the same line of business and using the same appliances are equally negligent. The evidence referred to in this requested instruction was competent and proper to be considered by the jury as bearing upon the question of whether or not the master exercised ordinary care in this respect; but to make such evidence conclusive on the jury by an instruction like that requested here would be to bind them to find that the other foundrymen were men of ordinary care and prudence in this respect. This might or might not be true. It was for the jury to say which. There is considerable testimony tending to show that the device in question is inherently and obviously defective for the purpose for which it is used when it becomes worn to such an extent as to cause or aggravate the lurch and splash described.

On the question of assumption of risk by the plaintiff the

case is quite close. There is, however, some evidence on the part of the plaintiff that he did not know of such lurch of the bucket or ladle or of the looseness of the pouring device and had no information concerning these matters; that prior to the day of his injury he had never caught in his hand ladle melted iron from the five-ton ladle; and the jury found his lack of knowledge in this regard by the sixth and seventh questions of the special verdict. The appellant contends that this was a case in which the question of the contributory negligence of the plaintiff and that of his assumption of the risk should have been separately submitted, as indicated in *Campshure v. Standard Mfg. Co.* 137 Wis. 155, 118 N. W. 633. We believe this view is correct. The appellant, however, did not properly request the submission of such question to the jury. He asked the court to submit:

"Was the spilling of melted iron which caused plaintiff's injuries a common occurrence in the business of molding, and one incident to plaintiff's work as a bench molder in defendant's foundry?"

If we eliminate the words "which caused plaintiff's injuries" or treat them as equivalent to "such as caused plaintiff's injuries," still the question would cover only one of the elements of assumption of risk, viz., that of the ordinary and usual nature of the occurrence, and would leave the case without finding whether the plaintiff knew or ought in the exercise of ordinary care to have known of such occurrences. The special verdict, on the other hand, did negative knowledge of this danger, actual or imputable, on the part of the plaintiff, thus in legal effect negativing assumption of risk. If the appellant seeks in such case to assign error for refusal to submit a question to the jury, he must first present a proper question fully covering the matter which he wishes to have submitted.

We do not think there was error in permitting the examination of Niedermeyer as an adverse witness nor in the admission of evidence, unless it be in the opinions of the witness Gaertner with respect to how much the gearing was worn two

years before. This last should have been excluded because the witness had no data upon which to base such an opinion. There is no uniformity of progress in such things. But the evidence was not prejudicial in view of the fact that it was contended on the part of the defendant that such gearings are always loose and necessarily loose, and that this burning of workmen with melted iron and this dip or lurch of the ladle is a common occurrence. But we are not convinced from the evidence that such gearings are always loose or necessarily loose to the extent that a lurch and a splash dangerous to workmen is usual or inevitable. If such condition, indeed, prevail, a little ingenuity on the part of foundrymen will make these appliances safe, take them out of the category of inherently dangerous devices in which the evidence in this case tends to place them, advance humane principles, and save the payment of damages to the injured.

The instructions of the court below to the jury seem to us very fair and impartial and sufficiently present the defendant's side of this case to the jury. Other errors are assigned, but it is unnecessary to notice them in detail. We are convinced that substantial justice has been done and no error prejudicial to the appellant has been found.

*By the Court.*—Judgment affirmed.