MAGNUS ANDERSON, Appellee, v. STANDARD OIL COMPANY, Appellant.

**NEGLIGENCE:** Acts Constituting Negligence—Inadvertent Mixing
1 **of Oils—Evidence.** Evidence quite closely analyzed, and held to present a jury question on the issue whether defendant oil company, in delivering oil to a customer, had placed gasoline in a tank intended for kerosene only, and was therefore guilty of negligence.

**EVIDENCE:** Weight and Sufficiency—Credibility of Witnesses—
2 Testimony Absurd and Impossible. Before the court may peremptorily stamp certain testimony as a nullity on the grounds that it is absurd, impossible, and contrary to fixed, known, scientific and physical facts and laws, it must be very certain, from the entire record, that no reasonable mind could entertain the truth of said testimony. Evidence reviewed as to the very unusual way in which it was claimed an explosion of oil occurred, and held not so inherently impossible as to justify its withdrawal from the jury.

*Appeal from Polk District Court.*—CHARLES A. DUDLEY, Judge.

MONDAY, SEPTEMBER 24, 1917.

ACTION at law for damages claimed to have resulted from an explosion of a mixture of kerosene and gasoline which had been sold to plaintiff as kerosene. Trial to a jury. Verdict for plaintiff. Defendant appeals.—*Affirmed*.

*Carr, Carr & Evans* and *Nourse & Nourse,* for appellant.

*John L. Gillespie,* for appellee.

STEVENS, J.—I. On the morning of March 21, 1915, while appellant was about to pour part of the contents of a can containing kerosene into a stove in a wash shanty near his residence, in which stove he had placed some paper and kindling, to which he had set fire a short time before, the oil in the can exploded, setting fire to his clothing and severely burning his hands and legs, thereby inflicting painful and permanent injuries upon both his hands and legs.

1. NEGLIGENCE: acts constituting negligence: inadvertent mixing of oils: evidence.

According to his testimony, he purchased the oil, a few days prior, of Whittaker & Burgess, retail dealers at Marquisville, Iowa; it was kept in the shanty prior to the accident; and shortly after setting fire to the paper in the stove, he left the shanty, returning in a few minutes, and, looking into the stove, saw no fire. This occurred about 9:00 A. M. He took the can containing the kerosene from a bench a short distance from the stove, and when within about 18 inches or 2 feet of the stove, he testifies that he unscrewed the cap from the top and placed his hand on the bottom of the can preparatory to pouring some of the liquid into the stove, when the can exploded, setting fire to his clothing and burning him, as above stated.

The defendant maintained a station at Altoona, from which point gasoline and kerosene were distributed by its agent, by wagon, to customers at near-by places. Upon receipt of the oil at Altoona, it is emptied from the tanks on the cars into storage tanks. The means employed makes it impossible for it to become mixed, either in filling the storage tanks from the cars or in emptying them into the tank wagon, unless by carelessness in pumping oil into the wrong compartment of the tank wagon. It appears from the evidence that the oil in the storage tanks, from which that in question was taken, had been previously inspected by the state oil inspector, and approved.

On the 17th of March, the agent of defendant filled the respective compartments or tanks on his wagon with kerosene and gasoline from the storage tanks at Altoona, and started to Marquisville to deliver oil to Whittaker & Burgess. On account of the bad condition of the roads, he was compelled to return to Altoona, and the following morning, backed a farm wagon up to within a few feet of the rear of his tank wagon, and in the usual way drew both gasoline and kerosene from the wagon tanks into a measuring bucket and poured the same into separate common 10-gallon milk cans. Defendant's agent testified that he first filled 20 cans with kerosene and placed the same in the front end of the wagon box; that he then placed the end gate from his wagon box immediately back of the cans and across the box, so as to make a partition, and then filled four 10-gallon milk cans with gasoline and placed the same in the wagon in such a way that the cans containing the gasoline and the cans containing the kerosene were separated by the end gate. He also testified that he placed red tags on the cans containing gasoline, on which were printed the words, "Gasoline—Dangerous." He further testified that the oil was drawn from the separate compartments of his tank wagon through a faucet; that same could be turned only with a wrench; and that in drawing kerosene it would foam up in the measuring bucket to a much greater extent than the gasoline.

Whittaker & Burgess had three storage tanks: one for gasoline, in an outbuilding; and two for kerosene, one known as the north and the other as the south tank. Upon the arrival of defendant's agent at Marquisville, he first emptied the cans containing gasoline into the tank in the gasoline house. He then emptied 10 cans of kerosene into the north tank, and then 10 cans of kerosene into the south tank, thereby emptying all of the cans which he had on his wagon. The gasoline was used or sold by Whittaker &

Burgess, and appears to have been good oil.   The oil in the storage tanks at Altoona from which the oil in question was drawn was sold, and no complaint was ever made of it.

The oil purchased by appellee was taken from the south tank.   Later, the oil inspector tested the oil in both the north and south tanks, the result of which was that the oil in the south tank was found bad, and in the north tank, good.   Burgess and Whittaker and a clerk testified to the manner of handling both the kerosene and gasoline at the store.   They used a 5-gallon and a 2-gallon can in measuring and selling the gasoline to customers, and when they sold five gallons, they used a 5-gallon can, and when they sold two gallons, they used a 2-gallon can.   The gasoline was kept in a separate building from the kerosene.   Without setting out the details of the evidence, they each testified that the method of drawing the oil from the tanks and delivering it to customers was such as to make it very improbable that there could have been negligence upon their part in doing so.

The oil that was put in the south tank by defendant's agent was sold to parties by the names of Brugioni, Amedi, Murray, Fletcher, Pinott and Ballentini, and to appellee. After the accident, the oil sold to Fletcher, Murray and Amedi was poured out.   Mrs. Brugioni undertook to use some of the oil with which to start a fire in the kitchen stove, when the same exploded, causing her death and that of her daughter. Mrs. Ballentini testified that she used some of the oil with which to start a fire; that, when she touched a match to it, the oil took fire, and the cap on the top of the can was blown therefrom a distance of 10 or 12 feet. Mrs. Anderson testified that, on the same morning, and shortly before the accident, she took the can to the kitchen and poured some of its contents into a lamp, which was at the time partly filled with oil.   A sample of the oil taken from the lamp was tested by the state oil inspector and

flashed at 84 degrees. A sample which it is claimed was taken from the Ballentini can was also tested by a deputy oil inspector, and flashed without applying any heat. Tests made of this oil showed that it would flash when a lighted match was brought within an inch of two or three tablespoonfuls emptied into a saucer. The state oil inspector testified that a sample claimed to have been taken from the Ballentini oil would take fire at any temperature above 32 degrees, and that it flashed at that temperature. He further testified that good, safe kerosene oil should not flash until it reached a temperature of 101 degrees. The temperature at the government station in Des Moines on the morning of the accident, at about the time the explosion occurred, was 31 degrees above zero. It was also claimed by appellee that samples of the oil were taken from the tanks by the representatives of defendant, and that the 35 gallons left in the south kerosene tank were taken away by defendant's agents.

The evidence satisfactorily shows that the oil in question and that contained in the south tank was a mixture of kerosene and gasoline. The evidence of some of the experts was that, under certain conditions, the gasoline would rise to the top of the can containing a mixture of kerosene and gasoline.

Appellant contends: (1) That it is as consistent, under the evidence, that the oil became mixed after its delivery to Whittaker & Burgess as before, and that, therefore, plaintiff has failed to make out a case of negligence; (2) that plaintiff's testimony regarding the explosion is so unreasonable and contrary to fixed, known, scientific and physical facts and laws as to be unworthy of belief; (3) that there was error in the admission of certain expert evidence offered by appellee; (4) that there was error in the refusal of the court to give an instruction requested by defendant regarding the direct cause of the explosion.

We have above set out substantially all of the evidence detailing the manner in which the oil in question was handled by the agent of defendant. He testified that the portion of the oil remaining in his tank wagon after filling the milk cans was sold, as was all of that in the storage tanks at Altoona, and that he never heard any complaint in regard thereto. The testimony of defendant's agent, who filled the milk cans with oil and delivered the same to Whittaker & Burgess, is contradicted to some extent by a farmer who went toward the road, to buy some oil from the wagon. He testified that he stood on an embankment near the wagon and about four feet above it. The evidence shows that the cans stood several inches above the top of the wagon box. The driver told him that the gasoline cans were tagged, but he testified that he saw no tags on them, and that he looked down into the wagon box, but observed no end gate or other partition between the cans.

As before stated, the witnesses detailed the method of taking the oil from the different tanks at the store, the kind of receptacles used, and the method of filling the cans of customers and delivering same to them. The gasoline tank of Whittaker & Burgess was in a building separate and at some distance from the tanks containing the kerosene. Defendant placed 100 gallons of kerosene in each of the tanks on the 18th of March. The oil in question was delivered to Mrs. Anderson on Friday, and the explosion occurred on Sunday morning, the 21st, so that but little, if any, opportunity existed after the delivery of the kerosene to Whittaker & Burgess and the sale thereof to Mrs. Anderson for the same to become mixed with gasoline. More than one third of the oil placed in the south tank was taken away by defendant after the Anderson explosion. We think it was a question for the jury to say whether or not the defendant was negligent in handling the oil, and caused the same to become mixed in the tank from which the same

was sold to Anderson. The rule regarding circumstantial evidence, as stated by the authorities cited by counsel for appellant, is undoubtedly correct, but the jury had the evidence of defendant's agent and of the several persons handling the oil at the store, and it was a question of fact to be determined by it, whether or not the proximate cause of plaintiff's injuries was negligence upon the part of defendant. The mixture of the oil was in the south tank, and no fact appears in evidence from which it is made to probably appear that same was mixed by the retail dealer. The court, in its instruction, submitted the question fully and clearly, and stated the rule substantially as contended for by counsel in argument. We think this point was fairly and properly submitted to the jury and that its finding thereon should not be disturbed. *Ellis v. Republic Oil Co.,* 133 Iowa 11.

II. Appellee testified that the can containing the oil was kept on a bench in the wash shanty, in which there had been no heat for several hours preceding his attempt to kindle a fire in the stove. We may assume that the temperature in the shanty was somewhat higher than that shown at the weather station on that morning. The can containing the oil had been taken from the shanty to the kitchen that morning. The evidence is silent, however, as to the length of time it was kept in the kitchen; nor is the temperature of that room shown. Plaintiff does not testify that there was no fire in the stove at the time he removed the cap from the top of the can, but that; when he looked, he saw no fire. A witness who examined the stove after the accident testified that the pipe was in place and the kindling did not have the appearance of having been burned. Plaintiff further testified that he was 18 inches or 2 feet from the stove at the time the explosion occurred. The temperature of the shanty, it may well be presumed,

was above 32 degrees, at which the sample claimed to have been taken from the Ballentini can flashed.

There is no doubt that courts generally recognize the rule that the testimony of a witness may be so absurd and unreasonable, impossible and self-contradictory that it should not be believed by court or jury, and should be treated as a nullity. Such was the holding of this court in *Graham v. Chicago & N. W. R. Co.*, 143 Iowa 604. See, also, *Lake Erie & W. R. Co. v. Stick*, (Ind.) 41 N. E. 365; *Weltmer v. Bishop*, (Mo.) 71 S. W. 167; and *Post v. United States*, 67 C. C. A. 569.

The Supreme Court of Kentucky, in *Louisville & N. R. Co. v. Chambers*, 178 S. W. 1041, 1043, referring to the rules relating to the credibility of witnesses, said:

"Of necessity, these rules cannot apply where the only evidence upon which such adverse party rests his right to succeed consists of a statement of alleged facts, inherently impossible and absolutely at variance with well-established and universally recognized physical laws. In such case, that which purports to be evidence is insufficient to constitute a compliance with the requirements of the scintilla rule, for it is the essence of that rule that there must be some evidence (however slight) upon which the jury might rationally find a verdict for the party producing it."

See, also, *Louisville Water Co. v. Lally*, (Ky.) 182 S. W. 186, and *Peat v. Chicago, M. & St. P. R. Co.*, (Wis.) 107 N. W. 355.

The Supreme Court of Wisconsin, in *Winkler v. Power & Mining Machinery Co.*, 124 N. W. 273, discussing a like question, used the following language:

"Appellant's counsel assigns numerous errors in the proceedings below, making his principal argument, however, on the proposition that the testimony on the part of the plaintiff relating to the manner in which his injury was inflicted is in contradiction of known physical laws, and

therefore impossible and incredible. This proposition must be supported by demonstration, not by mere conflict of evidence, and, in order to present it properly, all the necessary data for demonstration must appear affirmatively, and not depend upon mere credibility of other witnesses. * * * It is suggested that common sense is sufficient to show the incredibility or the impossibility of plaintiff's testimony. What is thought to be common sense is frequently nothing more than a fixed belief based on no evidence and supported by no reasons, and it then ordinarily lacks the certainty requisite for the annihilation of positive evidence to the contrary."

The same court, in *Salchert v. Reinig,* (Wis.) 115 N. W. 132, said:

"But when this stage has been passed, the question whether the court should direct a verdict, or whether this court on appeal may in effect do so, depends merely upon whether there is any credible evidence which, in the most favorable view, and granted all reasonable inferences and construction in favor of the conclusion of the jury, tends to support the verdict. To declare sworn testimony of a fact incredible, we must be convinced that it is so in conflict with the uniform course of nature or with fully established physical facts that no reasonably intelligent man could give it credence."

In *Bates v. Chicago, M. & St. P. R. Co.,* (Wis.) 122 N. W. 745, this court again said:

"On the question of contributory negligence, it is contended that the respondent must have seen and ought therefore to have avoided this pit or depression, and that her testimony to the effect that she did not see it is manifestly impossible and untrue. It requires an extraordinary case to authorize the court to so dispose of sworn testimony."

"So frequently do unlooked-for results attend the meeting of interacting forces that courts, in such cases, should

not indulge in arbitrary deductions from physical law and fact, except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." *Lang v. Missouri Pac. R. Co.,* 115 Mo. App. 489 (91 S. W. 1012) ; *Rattan v. Central Electric R. Co.,* (Mo.) 96 S. W. 735; *Scroggins v. Metropolitan St. R. Co.,* (Mo.) 120 S. W. 731; *Gessner v. Metropolitan St. R. Co.* (Mo.) 119 S. W. 528.

2. EVIDENCE:
weight and sufficiency: credibility of witnesses: testimony absurd and impossible.

Is the testimony of plaintiff so in conflict with established physical and scientific facts as to render the same wholly unworthy of belief, or should we say that, notwithstanding the extreme improbability of the explosion's occurring as detailed by him, yet the known physical facts are not so clear and irrefutable as to leave no room for the entertainment by reasonable minds of the conclusion that the explosion may have been caused substantially as detailed?

The evidence is without conflict that plaintiff went to the shanty about 9 o'clock Sunday morning for the purpose of kindling a fire in a stove in said shanty; that he placed paper and kindling in the stove, set fire to the paper, left the shanty, and shortly thereafter returned, looked into the stove and saw no fire. It does not appear that he had other errand or purpose in visiting the shanty at the time. A witness testified that, after the accident, he looked into the stove and saw kindling; that the stovepipe was in place; and that the stove bore no evidences of an explosion's having occurred therein. The presence in the shanty of the can containing the oil is established by the testimony of both plaintiff and his wife. The fact of the explosion is contradicted by no testimony, and the jury could have reached no other conclusion than that there was an explosion, setting fire to the clothing of plaintiff and

causing his limbs to be burned in the manner shown in evidence.

The temperature of the atmosphere at the weather station in Des Moines at or about the time of the explosion was 31 degrees above zero. The state oil inspector called as a witness by plaintiff testified that he tested two samples of oil; one, the jury under the evidence may well have found, came from a lamp in the Anderson home, and the other from the Ballentini can. The test of the two samples resulted differently. The Anderson oil flashed at a temperature of 84 degrees, and the other sample, without heating, at probably 32 degrees. The witness making the test testified that the latter sample, in his judgment, would flash at any temperature above freezing. The oil used was purchased from Whittaker & Burgess after the delivery in question by the agent of defendant, and was taken from the same storage tank. The jury may have inferred that the difference in the result of the test of the two samples is accounted for by the testimony of Mrs. Anderson, who testified that she poured a portion of the oil from the can into the lamp from which the sample was taken, which at the time contained a quantity of oil, making a different mixture. The jury may have inferred from the testimony that the sample which flashed without heat's being applied thereto was exactly like the oil in the Anderson can. The jury may reasonably have inferred that the Anderson can contained a quantity of gasoline, and that, under certain conditions, the gasoline would separate from the kerosene and rise to the top of the can.

It is ably argued by counsel for appellant that, even though all of the foregoing matters may possibly be sustained by some evidence, the explanation given by plaintiff of the explosion is so contradictory to known physical and scientific facts as to render the same utterly unworthy of belief. The temperature of the morning, as shown at

the government weather station, probably justified the jury in inferring that the temperature of the shanty was, at the time, 32 degrees or above, and that the oil in the Anderson can was the same as the sample taken from the Ballentini can, and would flash at any point above freezing. If the explosion could only result from vapor escaping from the can, coming in close contact with fire or heat, then may not the jury properly have inferred from the fact of the explosion that appellee was mistaken as to the presence of fire in the stove and distance he held the can from it? No evidence was offered to account for the explosion upon any other theory, and we do not feel that we can say, under all the facts and circumstances, as a matter of law, that appellee's testimony is so at variance with scientific facts and natural laws as to utterly destroy its value. Its weight and credibility were for the jury, and we cannot, in the absence of a showing of such disregard for the evidence as to amount to passion or prejudice, disturb its finding.

III. Complaint is made of the admission of certain testimony, and of the refusal of the court to give certain requested instructions. The instructions given by the court were sufficiently clear and explicit, and covered the point contained in the requested instruction. We think the court rightly refused to give the requested instruction. We find no error in the admission of testimony.

The judgment is—*Affirmed.*

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.